**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>              v.<br><br>CRUZ ROBERTO RAMOS-GONZALEZ,<br><br>       Defendants. | CR. NO. 07-0318 (PG) |

**OPINION & ORDER**

   There stands before the Court a motion to suppress evidence filed by defendant Cruz Roberto Ramos Gonzalez ("Ramos" or "Defendant") (Docket No. 2126).  Defendant seeks to suppress evidence pursuant to Rule 12 of the Federal Rules of Criminal Procedure and 18 U.S.C.§ 2515. The Defendant alleges that all video and audio recordings between attorney Ramon Delgado-Rodriguez a.k.a ("Bronco") and Government witness Harry Smith Delgado-Cañuelas ("Cañuelas"), as well as any anticipated testimony from Cañuelas made on December 7 and 11, 2007 at the Metropolitan Detention Center ("MDC") in Guaynabo, Puerto Rico should be suppressed because those recordings were made in violation of the Wiretap Act. 18 U.S.C.§ 2511 (2002).  Defendant further avers that the fact that the recordings violated various other federal statutes are therefore inadmissible in court.  In light of the relevant statutes and existing caselaw, and after careful consideration of the parties' motions, response, and reply the Court **DENIES** Defendant's request for the suppression of evidence.

CR. No. 07-0318 (PG)                                                Page 2

## I. BACKGROUND

### A. LITIGATION BACKGROUND

On August 2, 2007, a Grand Jury returned an Indictment against forty-four (44) defendants for federal narcotics and firearms violations[1], arising from their participation in a large criminal drug conspiracy principally based in the Victor Berrios Public Housing Project in Yabucoa, Puerto Rico. On February 5, 2008, a Grand Jury returned a Superseding Indictment adding two (2) defendants and adding additional charges against Ramos, the criminal organization's alleged ringleader, for tampering with a witness and obstruction of justice.[2]

A trial against Ramos and other defendants was held from October 13, 2009 to November 2, 2009. The jury found Ramos guilty on all six counts relating to the charges of conspiring to distribute narcotic controlled substances within 1,000 feet of a school zone and public housing project, and of conspiring to possess firearms in furtherance of these drug trafficking crimes.

The Court bifurcated the witness tampering Counts seven, eight, and nine from the controlled substance charges included in Counts one through six. As a result, these three remaining counts are now being addressed by the Court. The charges alleging conspiracy to tamper with a government witness, aiding and abetting in the tampering of the same witness, and aiding and abetting in the attempt to bribe the same

---

[1] The defendants were charged with conspiracy to distribute controlled substances(heroin, crack cocaine, cocaine, marijuana) within one thousand (1,000) feet of public housing authority or of a public school, all in violation of 21 U.S.C. §§ 841(a)(1),(b)(1)(A)(iii), 846 and 860; aiding and abetting to possess firearms in furtherance of drug trafficking crimes, in violation of 21 U.S.C. §§ 924(c)(1)(A); and aiding and abetting in the distribution of narcotic controlled substances (heroin, crack cocaine, cocaine, marijuana, and prescription drugs), all in violation of 21 U.S.C. §§ 841(a)(1) and 860, as well as 18 U.S.C. § 2.

[2] Ramos was charged with conspiracy to tamper with a government witness; aiding and abetting in the tampering of the same witness; and aiding and abetting in the attempt to bribe the same witness, all in violation of 18 U.S.C. §§ 1512(b)(1) and (k) and 18 U.S.C.§§ 201(b)(3) and 2.

CR. No. 07-0318 (PG)                                                    Page 3

witness were brought against Ramos, Jose Manuel Zabala-Marti ("Zabala"), Jean Carlos Medina-Flores ("Medina"), Hector O. Laboy-Vega ("Laboy"), Bronco, and Miguel A. Arroyo-Arroyo (Arroyo).  At this juncture, all other defendants have pled guilty to the three remaining counts or the counts have been dismissed against them.

**B. FACTUAL BACKGROUND**

On February of 2007, cooperating defendant Cañuelas was detained as a result of an incident that involved a shooting between Cañuelas and agents from the Humacao Drug Unit and charges were filed against Cañuelas.  Cañuelas quickly began cooperating with local authorities and was placed in the local witness protection program and came into federal custody in  the MDC.

During the period between November 8, 2007 and November 19, 2007 a meeting between cooperating defendant Cañuelas and Bronco, a licensed attorney in the Puerto Rico state court, was arranged by Laboy with the assistance of Zabala.  On December 1, 2007, Bronco and Arroyo, another lawyer, met with Cañuelas without the previous authorization of his attorney.  It is alleged that during this meeting, which was not recorded, Bronco asked Cañuelas to sign a piece of paper indicating that Bronco had authorization from the cooperating defendant to meet with him and that Cañuelas' attorney was aware of the visit.

The Federal Bureau of Investigations (FBI) sent the Warden of the MDC a letter in which it requested and through which it obtained authorization to conduct covert recordings of the meetings between Cañuelas and Bronco and Arroyo within the MDC. (Docket No. 934).  As a result subsequent meetings between Cañuelas and attorneys Bronco and Arroyo were audio and video recorded.  The recorded meetings spanned from December 10, 2007 until January 2008.  Defendant Bronco met with Cañuelas on December 7, 2007.  During this meeting Bronco hand-wrote a

CR. No. 07-0318 (PG)                                                    Page 4

sworn statement that contained false statements concerning Cañuelas' knowledge of the involvements of several defendants in Criminal Case No. 07-318 (PG).  Defendant Bronco then urged Cañuelas to sign and initial the statement.  The cooperating defendant signed the statement but reminded Bronco that the statements contained therein were false.  On December 10, 2007 Arroyo met with Cañuelas and urged the cooperating defendant to sign a typed version of the hand-written statement previously drafted by Bronco on December 7, 2007.  Cañuelas refused to sign the typed version of the statement after telling Arroyo that the statements contained therein were false.  On December 11, 2007, Bronco and Arroyo met with Cañuelas and sought to have him sign the typed version of the sworn statement.  During this meeting Bronco was recorded on audio and video assuring the cooperating defendant that he would receive payment for his statement in the amount of twelve thousand dollars (12,000).  Bronco again visited the cooperating defendant on January 2, 2008 with a slightly different false sworn statement in Bronco's handwriting and had Cañuelas sign it.  On February 5, 2008 a Superseding Indictment, which included charges of conspiracy to tamper with a government witness, aiding and abetting to tamper with a government witness, and aiding and abetting to bribe a government witness, was returned.

    Defendant seeks to suppress the recordings made on December 7, 2007 and December 11, 2007 at the MDC.  Defendant also seeks to suppress any testimony regarding those recordings.  Ramos asserts that the recorded conversations are excludable under 18 U.S.C.§ 2515.(Docket No.2126).  The government has opposed the Defendant's motion arguing that the Defendant lacks standing to challenge the admission of the recordings and that the recordings were not violative of the Wiretap Act or any other relevant statute. (Docket No. 2420).  Defendant further

submitted a reply to the government's motion in opposition to suppress in which Ramos asserts that he has standing to challenge the admissibility of the recordings under the work product doctrine and that the recordings should be suppressed because their recording violated federal policy.

## II. DISCUSSION

### A. STANDING AS AN AGGRIEVED PERSON

The first issue before the Court is whether Ramos has standing to challenge the recordings.  In order for the Court to make a determination on motion to suppress, it must first determine whether the defendant has adequate standing. United States v. Lipscomb, 539 F.3d 32, 35-36 (1st Cir. 2008), *cert. denied*, 129 S.Ct. 963 (2009); United States v. Williams, 580 F.2d 578, 583 (D.C. Cir. 1978).

A defendant has standing to challenge the admissibility of illegally obtained evidence when the defendant's constitutional rights have been violated. United States v. Salvucci, 448 U.S. 83, 86-87 (1980); United States v. Gonzales, 164 F.3d 1285, 1289 (10t Cir. 1999). The exclusionary rule limits the admissibility of evidence seized in violation of a defendant's Fourth Amendment rights. Mapp v. Ohio, 367 U.S. 643 (1961).  Moreover, the fruits of such evidence are also excluded from trial. Hudson v. Michigan, 547 U.S. 586, 591 (2006); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391-392 (1920). An accused party lacks standing to challenge the admission of evidence under the Fourth Amendment when he does not have a subjective and reasonable expectation of privacy in the area searched or the evidence seized. Minn. v. Carter, 525 U.S. 83, 91 (1988).  Fourth Amendment rights are personal rights "which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394

CR. No. 07-0318 (PG)                                                    Page 6

U.S. 165, 174 (1969).

In the context of intercepted oral or wire communications under Title III, any aggrieved person may move to suppress the contents of the evidence obtained in violation of the statue. 18 U.S.C. § 2518 (10)(a) (1998). An aggrieved person has been defined as "a person who was a party to an intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Id. at § 2510(11). Moreover, caselaw has established that the definition of an aggrieved person is to be construed in accordance with the rules of standing and may be not be vicariously asserted. Alderman at 175. In other words, the person challenging the legality of the evidence must establish "that he himself was the victim of an invasion of privacy." Id. at 174. Thus, Title III standing is almost identical to the standing requirements of the Fourth Amendment. United States v. Gallo, 863 F.2d 185, 192 (2d Cir. 1988).

The accused is considered an aggrieved party with standing to challenge the admissibility of an intercepted communication if he was a participant in the conversation, the target of the interception, or the owner of the premises where the illegal interception took place. Alderman at 188. See also United States v. Bianco, 998 F.2d 1112, 1122 (2d Cir. 1993) (stating that defendants lacked standing to challenge the interception because they where not present when the communication was made and they did not own the premises where the interception was made); United States v. Garcilaso de la Vega, 489 F.2d 761, 762 (2d Cir. 1974) (stating that defendant lacked standing to suppress wiretap because he was not a party to recorded conversation). Without the adequate showing that one of these factors was met, the defendant lacks the adequate standing to challenge the intercepted communication. Williams at 583.

In order to determine against whom the search was directed, the

CR. No. 07-0318 (PG)                                                    Page 7

Court must take into consideration against whom the government sought to obtain information. Mabra v. Gray, 518 F.2d 512, 514 (7th Cir. 1975). See also Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (citing Alderman at 174) (stating that a person aggrieved is one that is targeted by the investigation and distinguished from one that claims prejudice from the use of evidence gathered from a search directed at another); Gallo at 162 (identifying the targets of the surveillance as those named as such).  Even though the police may have hoped that the wiretaps in question may incriminate Ramos, that hope is insufficient to establish standing in cases where the police have legitimate reasons for searching another defendant. Mabra at 514.  Moreover, co-conspirators and codefendants have not been accorded special standing to enforce the exclusionary rule. United States v. Capra, 501 F.2d 267, 281 (2d Cir. 1974)(citing Alderman, at 172); United States v. Timoteo, 353 Fed.Appx. 968, 971 (5th Cir. 2009); United States v. Goldsmith, 432 F.Supp. 2d 161, 174 (D.Mass. 2006).  The Court has found only one instance in which a sister court granted aggrieved person status to a defendant who was not a direct participant in the recorded conversation.[3]

   In the instant case, the Defendant asserts that he was the target of the interceptions and therefore he has standing to contest the recordings.  The Court cannot agree with Defendant's assertion.  The record clearly states that Ramos was not part of the recorded conversations and that the conversations took place in the MDC. (Docket No. 2437 ).  As a result, Defendant is not an aggrieved person under the statutory definition.

---

[3] United States v. King, 478 F.2d 494, 506 (9th  Cir. 1973) (stating that the defendant qualified for aggrieved person status to challenge a wire-tap because on at least one occasion a message was sent at his direction and a reply to that message was intercepted by the Government). This Court upon an examination of this case remains unconvinced by the reasoning employed in King. The King Court did not cite any caselaw  in its conclusion of standing and this Court was unable to find any similar standing conclusions in the existing jurisprudence.

CR. No. 07-0318 (PG)                                                   Page 8

Ramos further contends that the recordings in dispute were directed at him because he is named in the letter directed at Warden Haynes, in which the Federal Bureau of Investigation (FBI) solicits permission to record the conversations in question. (Docket No. 934). The Court is also unable to agree with this assessment. In order for the Court to conclude that the Defendant was targeted by the wiretap, the accused must be named as such in the order authorizing the interception. United States v. Lavin, 604 F.Supp. 350, 353(D.C. Pa. 1985). See also United States v. Fury, 554 F.2d 522 (2d. Cir. 1977) (stating that a person may only challenge a wiretap if he was a participant of the intercepted communication or the wiretap was directed at him); United States v. Barrios, 994 F.Supp. 1257, 1266 (D.Colo. 1998) (applying a common-sense fashion under the totality of the circumstances to conclude who were the targets of the wiretaps).

Ramos' name appears in the FBI letter asking for permission to record the conversation. However, the Court concludes that his name appears as an identifier for the lawyers who were the target of the interceptions. The recordings in dispute were targeted against the lawyers who would meet with Cañuelas and were not directed against Ramos. As a result, Ramos does not fit within the definition of an aggrieved person and the Court finds that he lacks the required standing to suppress the recordings.

**B. STANDING UNDER THE WORK PRODUCT DOCTRINE**

Defendant also claims that he has adequate standing to challenge the admission of the recordings under the work product doctrine. Although Defendant does not explicitly state his argument, the Court understands that he claims that he has standing to suppress the recordings because they are protected by the work product doctrine and are subject to an expectation of privacy under the Fourth Amendment. As

CR. No. 07-0318 (PG)                                                    Page 9

discussed in the previous section, the Court understands that the Defendant is not an aggrieved person with standing to challenge the recordings. Moreover, the Court finds that Defendant lacks standing to assert any Fourth Amendment claims under the work product doctrine.

The work product privilege exempts documents prepared by an attorney in contemplation of litigation. United States v. Nobles, 422 U.S. 225, 238 (1975); United States v. Textron Inc. and Subsidiaries, 577 F.3d 21, 29-30 (2d Cir. 2009); Haines v. Liggett Group Inc., 975 F.2d 81, 93 (3d Cir. 1992) (citing Hickman v. Taylor, 329, U.S. 495, 511 (1947)); Moody v. Internal Revenue Service, 654 F.2d 795, 798 (D.C. Cir. 1981). The work product doctrine applies in both the criminal and civil context. Nobles at 236. Some courts have stated that the work product doctrine may be asserted by either the client or the attorney. In re Grand Jury Proceedings, 604 F.2d 798, (3d Cir. 1979); Moody v. Internal Revenue Service, 654 F.2d 795, 801 (D.C. Cir. 1981). The First Circuit seems to have impliedly adopted the posture that the work product doctrine may be asserted by the client or an attorney. In re Grand Jury Subpoena, 274 F.3d 563, 574 (1st Cir. 2001). However, the ability to invoke the work product doctrine extends only to legal work performed exclusively for the client as an individual. Id. at 574. Furthermore, work that is prepared by lawyers or represents legal thinking is insufficient to accord work product protection unless the work was performed in anticipation of litigation. Textron, at 29-30.

The Court agrees that the purpose of the work product doctrine is to protect an attorney's interest in his work prepared in anticipation of litigation.[4] In re Murphy, 560 F.2d 326, 326 (8th Cir. 1977). The

---

[4] In the criminal context Rule 16 of the Federal Rules of Criminal Procedure provides protection to portions of reports, memoranda, or internal documents that contain the mental impressions of an attorney. As a result, the protection afforded to work product in the criminal context is more extensive than the protection afforded to work product in the civil arena. EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 293-294

CR. No. 07-0318 (PG)                                                    Page 10

Court further agrees with Defendant's statement that attorney's mental impressions are "reflected, of course, in interviews, statements, memoranda, and countless other tangible and intangible ways." Hickman v. Taylor, 329 U.S. 495, 511 (1947).

The work product doctrine is also vulnerable to the crime or fraud exception in situations where the work product is part of a criminal scheme. In re John Doe Corp., 675 F.2d 482, 491-492 (2d Cir. 1982);  In re Special September 1978 Grand Jury (II), 640 F.2d 49, 62 (7th Cir. 1980). See also  In re Doe, 662 F.2d 1073, 1078-1079 (4th Cir. 1981) (clarifying that the work product doctrine should not lend itself to use by lawyers seeking to insulate themselves from criminal prosecution).

Other sister courts have concluded that it would be perverse "to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent." Moody v. Internal Revenue Service, 654 F.2d 795, 800 (D.C. Cir. 1981).  In other words, caselaw disfavors the use of the work product doctrine in order to cover up activities that are destructive of the legal system. Id.  The Second Circuit has further stated examples of actions that are unlikely to be protected by the work product doctrine, "Similarly, where a party suborns perjury by a witness to bolster a claim or defense, [c]ommunications or work product relating to that witness may also be discoverable." In re Richard Roe, Inc., 168 F.3d 69, 72 (2d Cir. 1999).

The Fourth Amendment protects against unreasonable search and seizure. In order to have standing the party seeking suppression must show that he/she has a subjective and reasonable expectation of privacy in the area searched or the evidence seized. Carter at 91.  Secondly,

---

(3d ed. 2007).

CR. No. 07-0318 (PG)                                                  Page 11

the expectation of privacy should be one that society is prepared to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361 (1967). A person may assert a reasonable expectation of privacy by reference to real or personal property law or to understandings that are recognized and permitted by society. Carter at 119 (citing Rakas, at 143 (1978)); United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002).

In his motion, Defendant claims to have standing under the work product doctrine and the Fourth Amendment to suppress the contested recordings. The Court disagrees with Defendant. The First Circuit has adopted the view that both the client and the attorney may invoke the protection of the work product doctrine. However, this standing is limited to work product done exclusively for the client claiming the privilege. In re Grand Jury Subpoena at 574. In the present case, Bronco's meetings with Cañuelas were at the instance of other co-defendants. (Docket No. 1159). The Court must therefore conclude that Bronco did not meet with Cañuelas in representation of Defendant exclusively and as a result Ramos lacks the adequate standing under the work product doctrine.

The Court further concludes that even if Defendant met the work product standing requirements, the recordings in question would not be protected. The meetings between Bronco, Arroyo, and Cañuelas were directed at convincing Cañuelas to submit false sworn testimony rather than to interview a potential witness. (Docket No. 2437). The mere fact that Bronco was a licensed attorney and working for Defendant when he met with Cañuelas does not mean that the conversations are automatically protected under the work product doctrine. Moreover, Bronco was not licensed to practice in the District Court of Puerto Rico and as a result his meetings with Cañuelas could not have possibly been prepared in anticipation of litigation concerning the federal charges against

Ramos.

Thus, the Court concludes that Bronco did not meet with Cañuelas in his capacity as a lawyer and as a result the recorded conversations are not protected by the work product doctrine, nor do they have an expectation of privacy under the Fourth Amendment.

## C. Attorney-Client Privilege

The recording of inmate and attorney conversations is generally not permitted except under narrow circumstances. 28 C.F.R. § 543.13(e). Federal policy establishes that a Warden may permit tape recordings during an attorney visit only with a previous statement in advance and for the sole purpose that the recording is used to facilitate the attorney-client or attorney witness relationship. Id.  Furthermore, 28 C.F.R. § 501.3(d) states that the Bureau of Prisons shall provide appropriate procedures to monitor communications traditionally covered by the attorney-client privilege.  The statute specifies that conversations covered by the attorney-client privilege may be monitored when there exists a reasonable suspicion that an inmate may use the communication with the attorney to further acts of terrorism. 28 C.F.R. § 501.3(d).  When such a situation arises the statute permits the monitoring of inmate-attorney conversations, as long as there is proper notice given to the inmate or there exists prior court authorization to monitor the communications. Id. at 501.3(d)(2).  The cited regulations clearly express their application to those communications that fall under the scope of the attorney-client privilege.

The burden of showing the existence of the attorney-client privilege lies with the party claiming the privilege. F.D.I.C. v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000).  Additionally, the attorney-client privilege is one that generally belongs to the client. In re Impounded Case, 879 F.2d 1211, 1213 (3rd Cir. 1989). Said privilege

protects confidential communications that are made for the purpose of seeking or receiving legal advice. In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003).

Nonetheless, the attorney-client privilege may be pierced under the crime-fraud exception. The Supreme Court affirmed that the attorney-client privilege "takes flight if the relation is abused" and therefore it does not apply when a client seeks advice from a lawyer that will serve him in the commission of a crime or fraud. Clark v. United States, 289 U.S. 1, 15 (1933).

The attorney-client privilege is governed by Federal common law. United States v. Buitrago-Dugand, 712 F. Supp. 1045, 1047 (D.P.R. 1989). A claimant must establish several factors in order to invoke the attorney-client privilege. United States v. Stern, 511 F.2d 1364, 1367-68 (2d Cir. 1975). These factors include : '(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . ..' 8 Wigmore, Evidence § 2292 (McNaughton Rev. 1961).

As a result, an attorney-client relationship depends on an arrangement between the attorney and the client that extends beyond the mere fact that a person who happens to be an attorney met with the alleged client. Sheinkopf v. Stone, 927 F.2d 1259, 1265 (1st Cir. 1991). To conclude that an attorney-client relationship exists it must be objectively reasonable under the totality of the circumstances. Id.

In his motion to suppress, Ramos attempts to convince the Court that the recorded conversations where covered under the attorney-client privilege. However, Defendant does not provide reasoning for this

conclusion, nor does he cite relevant caselaw that would aid the Court in reaching this conclusion.  The Court in its analysis and application of the law to the facts concludes that the totality of the circumstances suggest that there was no attorney client relationship. At the time that Cañuelas met with Bronco and Arroyo, he was already represented by the Office of the Public Defender and Cañuelas was not seeking legal advice. Moreover, the recorded conversations were not legal in nature and the meetings were concerned with illegal efforts to encourage Cañuelas to submit a false statement. (Docket No.2437).  Thus, when we examine the totality of the interactions between Cañuelas, Bronco, and Arroyo we conclude that there was no attorney-client relationship and that the federal protections offered to attorney-client conversations do not extend to the communications that the Defendant seeks to suppress.  The Court does not find it necessary to enter into an analysis regarding the crime-fraud exception because it finds that the attorney-client privilege is inapplicable in this case.

**D. Wiretap Act**

Title III prohibits the interception of wire, oral, and electronic communications. 18 U.S.C. § 2511 (2008).  This statute clearly prohibits the intentional interception of any wire, oral, or electronic communication. Id. at 2511(1)(a).  Moreover, the statute limits the ability to disclose information obtained through the interception of any wire, oral, or electronic communication. Id. at 2515(1)(c).  However, the Wiretap Act allows for the interception of communications in cases where the intercepting party is acting under the color of law or one of the parties to the communication has consented to the interception. Id. 2511(2)(c).  This exception to the Wiretap Act has been further sustained by caselaw, which affirms that the warrantless recording of a conversation with the consent of one of the parties may be admitted into

CR. No. 07-0318 (PG)                                                  Page 15

evidence in federal prosecution. <u>United States v. Faulkner</u>, 439 F.3d 1221, 1223 (2d. Cir. 2006); <u>United States v. Seibert</u>, 779 F.Supp. 366, 368 (E.D. Pa. 1991)(citing <u>United States v. Armocida</u>, 515 F.2d 49, (3d. Cir. 1975)).

There exists no dispute as to the fact that Cañuelas consented to the recordings in question, as evidenced in the record. (Docket No. 934) As a result, the recordings in dispute complied with the requirements outlined in 18 U.S.C. 2511(2)(c). Thus, the Court finds that the recordings complied with the relevant statute.

### III. Conclusion

For the reasons set forth above, the Court **DENIES** the Defendant's motion to suppress evidence (Docket No. 2126).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, October 25, 2010.

                                             JUAN M. PEREZ-GIMENEZ

                                             U.S. DISTRICT JUDGE